1  JARRETT A. GREEN (SBN 237443)
       jagreen@nexus-law.com
2  NEAL S. ZASLAVSKY (SBN 277543)
       nszaslavsky@nexus-law.com
3  **NEXUS LAW GROUP, LLP**
   30 N. Raymond Ave., Suite 304
4  Pasadena, California 91103
   Telephone:  (626) 689-2004
5  Facsimile:   (626) 689-2005

6  *Attorneys for Plaintiffs*
   *James Dolan, The FaceTime Group, Inc., and*
7  *FaceTime Recruiters, Inc.*

8

9                  **UNITED STATES DISTRICT COURT**

10               **CENTRAL DISTRICT OF CALIFORNIA**

11  _____

12  JAMES DOLAN, an individual; The      )   Case No.
    FaceTime Group, Inc., a California   )
13  corporation; and FaceTime Recruiters,)
    Inc., a California corporation,      )
14                                       )   **COMPLAINT FOR:**
                    Plaintiff,           )
15                                       )   **(1)  TRADEMARK**
                 v.                      )        **INFRINGEMENT;**
16                                       )
    CMTC, a California corporation; CMTC )   **(2)  TRADE SECRET**
17  HC LLC, a California corporation; Jack)       **MISAPPROPRIATION;**
    Van Buren, an individual; James Watson,)
18  an individual; Doug Garnee, an       )   **(3)  PROMISSORY ESTOPPEL;**
    individual; and DOES 1 through 10    )
19  inclusive,                           )   **(4)  FRAUD OR DECEIT;**
                                         )
20                  Defendants.          )   **(5)  NEGLIGENT**
                                         )        **MISREPRESENTATION;**
21  _____     )
                                             **(6)  CONVERSION;**
22
                                             **(7)  UNJUST ENRICHMENT /**
23                                                **QUANTUM MERUIT /**
                                                  **RESTITUTION;**
24
                                             **(8)  TORTIOUS INTERFERENCE**
25                                                **WITH CONTRACTUAL**
                                                  **RELATIONS  ;**
26
                                             **(9)  DEFAMATION;**
27                                           ///

28                                           ///

                                     COMPLAINT FOR DAMAGES,
                                DECLARATORY AND INJUNCTIVE RELIEF

CV12- 08384 MRP(Ex)

FILED
CLERK, U.S. DISTRICT COURT

SFP 28 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(10)  **VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200 ET SEQ., UNLAWFUL, FRAUDULENT AND UNFAIR BUSINESS ACTS AND PRACTICES.**

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs James Dolan ("Mr. Dolan"), The FaceTime Group, Inc. ("FaceTime Group"), and FaceTime Recruiters, Inc. ("FaceTime Recruiters") (collectively "Dolan"), hereby complain against Defendants California Manufacturing Technology Consulting, Inc. ("CMTC"), CMTC HC LLC, Jack Van Buren, James Watson and Doug Garnee, and allege, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, as follows:

## JURISDICTION AND VENUE

1.     This Court has federal question jurisdiction over this matter because Dolan has asserted a claim under the Lanham Act against Defendants.

2.     This Court personal jurisdiction over each of the Defendants because CMTC's principal place of business is in California and because the Individual Defendants reside in California.  Moreover, personal jurisdiction over each of the Defendants exists by virtue of the fact that the Defendants' actions that are the subject matter of this litigation all occurred in California.

3.     The Central District of California is the proper venue for this matter pursuant to 28 U.S.C. § 1391(a) because a substantial amount of the events and omissions giving rise to this action occurred within this judicial district.

## PARTIES

4.     Plaintiff Mr. Dolan is an individual residing in Los Angeles County, California, who has spent his career serving as a recruiting consultant.  He is the founder and owner of both the FaceTime Group and FaceTime Recruiters.

5.     Plaintiff FaceTime Group is company based in Los Angeles County, California, that was incorporated in 2001 and which provides recruiting services to a variety of companies, entities, individuals and other clients.  Plaintiff FaceTime Recruiters is a company based in Los Angeles County, California, that was incorporated in 2004, and into which FaceTime Group was consolidated, and which

COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

provides recruiting services to a variety of companies, entities, individuals and other clients.

6.     Plaintiff FaceTime Group and Plaintiff FaceTime Recruiters are collectively referred to as "FaceTime" throughout this Complaint.  FaceTime and Mr. Dolan are collectively referred to as "Dolan" throughout this Complaint.

7.     CMTC is a non-profit company based in Los Angeles County, California, that provides consulting services in the manufacturing industry.

8.     Jack Van Buren ("Mr. Van Buren") is, and at all relevant times was, the CFO of CMTC.

9.     James Watson ("Mr. Watson") is, and at all relevant times was, the President and CEO of CMTC.

10.    Doug Garnee ("Mr. Garnee") is, and at all relevant times was, the Director of Human Resources of CMTC's healthcare division, and oversaw (with Michelle Evans ("Ms. Evans")) that division.

11.    CMTC HC LLC, is a for-profit company based in Los Angeles County, California, which is an arm of CMTC and which has three controlling members – i.e. – Messrs. Van Buren, Watson and Garnee.  On information and belief, CMTC HC LLC is a for-profit company set by CMTC which operates without the oversight of CMTC's board of directors, and through which certain CMTC revenues are funneled for the benefit of CMTC HC LLC's three controlling members.  It is indeed troubling that a supposed non-profit company funnels substantial portions of its revenue through a for-profit company.  CMTC HC LLC is also infringing Dolan's trademarks and misappropriating his trade secrets.

12.    CMTC, Mr. Van Buren, Mr. Watson, Mr. Garnee and CMTC HC LLC are collectively referred to as "Defendants" throughout this Complaint.

13.    The true names of the defendants sued herein as Does 1-50, inclusive, are not known to Dolan at this time.  Such defendants are other persons or business entities who are responsible for the conduct alleged herein and who are liable to Dolan

COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

1  as a result thereof.  Plaintiffs will seek leave of Court to amend the Complaint to set

2  forth their true names and capacities when this information is ascertained.

3

4  ## **ALLEGATIONS**

5

6  **After Retaining Dolan As An Independent Contractor,**

7  **CMTC Blatantly Infringes Dolan's HIRE FOR SUCCESS Mark,**

8  **Which Dolan Exclusively Created And First Used In Commerce**

9  14.    Dolan has spent his career serving as a recruiting consultant.  He

10  specializes in providing innovative, sophisticated and creative recruiting plans,

11  theories and guidance to his various clients.  His industry-specific and client-specific

12  plans and theories

13  15.    He has provided recruiting services to a wide variety of companies,

14  business entities, individuals and other clients throughout his career, including to

15  Ashley Furniture, Good Year Rubber Company, NextDayFlyers, Moog, and many

16  other prestigious and high-profile clients.

17  16.    On May 1, 2002, Dolan and CMTC entered into a recruiting contract (the

18  "Recruiting Contract"), pursuant to which Dolan would provide recruiting services to

19  CMTC in its operations.  A true and correct copy of the Recruiting Contract is

20  attached hereto as Exhibit A.  However, well in advance of ever being retained by

21  CMTC, Dolan created and began openly and actively using the HIRE FOR SUCCESS

22  mark in commerce.  Indeed, in 1998 first Dolan developed the mark, and in 2001,

23  Dolan began openly and actively using the mark in commerce.

24  17.    Dolan exclusively created the HIRE FOR SUCCESS name and mark,

25  and CMTC had absolutely <u>nothing</u> to do with its creation.

26  18.    Undisputed documentary evidence in this case will demonstrate that

27  Dolan exclusively created the HIRE FOR SUCCESS mark, and was (by far) the <u>first</u>

28  to use the HIRE FOR SUCCESS mark in commerce.  Dolan is in possession of

-3-

FaceTime brochures dating back to 2001, which reflect that FaceTime was actively and openly using the HIRE FOR SUCCESS mark long before ever being retained as an independent contractor by CMTC on May 1, 2002.  (See, e.g., Exhibit B, "2001 The FaceTime Group – Hire For Success Brochure.")  In fact, when Dolan met with CMTC to "pitch" his business to CMTC in advance of May 1, 2002, Dolan submitted "pitch" materials to CMTC which expressly contained the equivalent HIRE FOR SUCCESS mark.  CMTC's current claim that it exclusively developed the HIRE FOR SUCCESS mark and was the first to use the mark in commerce is nothing short of absurd.

19.    Contemporaneous written correspondence between Dolan and his clients in 2001 also conclusively demonstrate that Dolan developed and began using in commerce the HIRE FOR SUCCESS mark before CMTC ever learned of or even used the mark (which occurred for the first time in 2002 – in furtherance of the Recruiting Contract).  For example, in approximately June of 2001, Dolan was retained by Santec Faucets ("Santec"), a Torrance-based bathroom and kitchen fixture company, to provide recruiting services.  On August 7, 2001, Dolan submitted an invoice by mail to Santec in the amount of $2,800 for the recruitment and placement of a new employee named Yuri Burkman.  Critically, the invoice that Dolan issued to Santec – which bears a date of August 7, 2001 – expressly contains the HIRE FOR SUCCESS mark on its face.  A true and correct copy of that invoice is attached hereto as Exhibit C.  Moreover, Dolan received payment on the invoice on August 21, 2001.  A true and correct copy of the check and remittance voucher that satisfied the invoice is attached hereto as Exhibit D.

20.    Moreover, in addition to the undisputed documentary evidence in his possession, Dolan will present a litany of witnesses in this case who will provide sworn testimony that Dolan was the exclusive creator of the HIRE FOR SUCCESS mark and began openly and actively using the mark in commerce before ever being

-4-

1    retained by CMTC in 2002 (which is when CMTC claims it began first using the

2    mark).

3        21.    For example, Sunny Lopez ("Ms. Lopez") worked for CMTC from 1998

4    through 2009 in the marketing department.  In 2002 when CMTC contracted with

5    Dolan, Ms. Lopez was CMTC's Marketing Coordinator.  Ms. Lopez has stated and

6    will testify in this case that Dolan, not CMTC, created the HIRE FOR SUCCESS

7    mark.  Ms. Lopez will further testify that CMTC never used the HIRE FOR

8    SUCCESS mark until Dolan presented his own marketing and recruiting materials to

9    CMTC (which materials contained the HIRE FOR SUCCESS mark).

10        22.    Jerry Kelly ("Mr. Kelly"), a former CEO of FaceTime Group, has stated

11    and will testify that Dolan first conceived of and created the HIRE FOR SUCCESS

12    mark in 1998.  Mr. Kelly will further testify that Dolan began using the HIRE FOR

13    SUCCESS mark openly and actively in commerce in the year 2001, and that he

14    continually used the mark up until and throughout the 2002 Recruiting Contract with

15    CMTC.

16        23.    Mitch Markowitz ("Mr. Markowitz"), CMTC's Business Development

17    Manager from 1999 to 2003, has stated and will testify that Dolan conceived of and

18    created the HIRE FOR SUCCESS mark.  Moreover, Mr. Markowitz will testify that

19    CMTC never used the HIRE FOR SUCCESS mark until after retaining Dolan in May

20    2002, and that by that time, Dolan had already been openly and actively using the

21    mark in commerce.

22        24.    To the extent that Dolan needs to prove this simple and uncontroversial

23    fact any further, he will be able to call at least 10 additional individuals who were

24    members of CMTC's sales staff prior to and at the time Dolan was retained by

25    CMTC.  These individuals will uniformly testify that Dolan created the HIRE FOR

26    SUCCESS mark on his own before being retained by CMTC, and that CMTC only

27    began using the HIRE FOR SUCCESS mark after retaining Dolan and viewing his

28    HIRE FOR SUCCESS mark on his documents and materials.

-5-                    COMPLAINT FOR DAMAGES,
                       DECLARATORY AND INJUNCTIVE RELIEF

25.    As revealed by the undisputed and dense evidence on the issue, Dolan created the HIRE FOR SUCCESS mark, was the first party to openly and actively use the mark in commerce, and has continually used the mark in commerce since 2001.

26.    Under basic principles of trademark law, the HIRE FOR SUCCESS mark currently is, *and always has been*, Dolan's mark.  Notwithstanding this fact, CMTC now asserts that the HIRE FOR SUCCESS mark is its mark, and that CMTC somehow has the legal right to continue using the mark (<u>and</u> prevent Dolan from using the mark).  CMTC's assertion is contrary to basic principles of trademark law, and the litany of undisputed evidence that will be presented in this case.

27.    Indeed, CMTC first began using the HIRE FOR SUCCESS mark in conjunction with – *and subsequent to* – its 2002 contract with Dolan.  By that time, Dolan had been actively and openly using the HIRE FOR SUCCESS mark (which he exclusively created) in commerce for a significant period of time, and had established consumer recognition and goodwill in the recruiting market.

28.    CMTC apparently believes that it somehow obtained trademark rights over Dolan's mark simply because Dolan began using the HIRE FOR SUCCESS mark in connection with CMTC in 2002, pursuant to his independent contractor agreement.  Of course, that CMTC entered into an independent contractor agreement with Dolan in May 2002 does <u>nothing</u> to alter the fact that the HIRE FOR SUCCESS mark, *which Dolan exclusively created and used in commerce before ever being retained by CMTC*, was and is Dolan's intellectual property.  Indeed, the 2002 Recruiting Contract between CMTC and Dolan was a standard independent contractor agreement, pursuant to which Dolan provided CMTC with recruiting consulting services in exchange for a commission for each candidate that he successfully placed. (<u>See</u> Ex. A.)

29.    Unsurprisingly, the Recruiting Contract does <u>not</u> include an assignment or sale of Dolan's mark to CMTC, nor does it include so much as a license for CMTC to independently use the mark.  Instead, the Recruiting Contract merely created a

COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

business agreement whereby Dolan would utilize his recruiting services – which necessarily included his name, his skill and his mark – in order to assist CMTC to attract and hire quality employees.  In furtherance of his performance under the agreement, Dolan continued to use his HIRE FOR SUCCESS mark in performing recruiting services on behalf of CMTC.

30.     By merely retaining Dolan as an independent contractor to provide recruiting services on its behalf (and hence by benefitting from Dolan's use of the mark), CMTC did not somehow magically become the owner of Dolan's mark.

31.     To the contrary, the mark continued to be Dolan's exclusive property, and Dolan's continued use of the mark in commerce in furtherance of the independent contractor agreement only further cemented and increased the goodwill that consumers and the market attached to Dolan's use of the mark.  CMTC badly misunderstand the law in now asserting that the HIRE FOR SUCCESS mark somehow became CMTC's intellectual property simply because Dolan provided recruiting services for CMTC in furtherance of his independent contractor agreement.

32.     Under basic principles of trademark law, as well as common sense, if Party A retains Party B as an independent contractor to provide a discrete and specialized service, Party A does <u>not</u> become the owner of Party B's trademarks. Under CMTC's tortured legal theory, CMTC would also be the owner of the trademark of any of its vendors or independent contractors that it uses in furtherance of its business operations.  For example, CMTC has retained the law firm of Knobbe Martens Olson & Bear LLP in order to represent it in this matter and in order to take actions on its behalf in this matter.  Apparently CMTC believes that simply because it retained that firm to provide legal services on its behalf, it now has the legal right to use the "Knobbe Martens Olson & Bear LLP" mark (and prevent that law firm from using the mark).  CMTC's position reflects a fundamental misunderstanding of trademark law.

COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

33.    Because the HIRE FOR SUCCESS mark is undoubtedly Dolan's legal mark, CMTC is committing trademark infringement by using the mark without Dolan's authorization or permission.

34.    For similar reasons, the HEALTHCARE HIRE FOR SUCCESS mark is also Dolan's – and not CMTC's – mark.  Not only did Dolan create this mark, but the secondary meaning that has attached to this mark was the result of services Dolan performed under the independent contractor agreement.  Moreover, because Dolan undoubtedly owns the HIRE FOR SUCCESS mark, the HEALTHCARE HIRE FOR SUCCESS mark, which is a mere derivation or permutation of Dolan's well-established mark, is also his for the independent reason that this slight derivation is confusingly similar to Dolan's well-established mark.

### CMTC Has Misappropriated Dolan's Trade Secrets

35.    In addition to infringing Dolan's trademark, CMTC is also misappropriating Dolan's trade secrets.  Dolan spent several months developing his "Recruiting Desktop Procedures" and "Recruitment Process Flowchart" – both of which are lengthy and highly detailed processes, methods and programs for obtaining ultimate recruiting success.  True and correct copies of these documents shall be filed forthwith in this Court, under seal, as Exhibits E and F, respectively.

36.    Dolan exclusively created both documents (and all of their content) and subsequently presented them to CMTC.  Both documents are raft with highly sophisticated, creative and commercially valuable information, processes and systems – all of which were exclusively created by Dolan after months of intensive efforts.  Because the information, processes and systems contained in both documents carry independent economic value (actual or potential) as a result of not being generally known to the public, and because Dolan made reasonable efforts to maintain the secrecy of the information, processes and systems, the documents contain valuable trade secrets that belong to Dolan.

-8-

37.     Notwithstanding the foregoing, CMTC is now using Dolan's trade secrets for its own commercial benefit.  This use constitutes trade secret misappropriation under California law.

38.     As explained more thoroughly below, Dolan created his set of core recruiting procedures and methods, which would guide the entire process of hiring the more than 1,000 employees for the re-opening and re-staffing of the MLK hospital in Los Angeles (which hospital had been previously shut down by the federal government due to patient care violations).  Importantly, and as further explained below, Dolan's creation of the "Recruiting Desktop Procedures" and "Recruitment Process Flowchart" and performance of the related tasks for the MLK project were extraordinarily time-consuming and complex, and were plainly outside the scope of the narrow tasks Dolan was required to perform under the 2002 Recruiting Contract, which CMTC acknowledged.

39.     Consequently, in light of the distinct nature of the MLK project and the unique and far broader and more sophisticated services Dolan would be required to perform for this project, CMTC verbally represented to Dolan that he would receive a 10% commission on each new hire that was made at the MLK hospital (in contrast to the formula called for by the 2002 Recruiting Contract, which fixed Dolan's commission at 35% of 10% of the first year salary of the new hire, see Ex. A at 1).

40.     It was therefore extraordinarily clear to the parties the services Dolan would perform in connection with the MLK project were outside the far more narrow scope of the 2002 Recruiting Contract.  As further explained below, Dolan performed these additional, complex, sophisticated and time-consuming tasks in reliance on the false representations that CMTC made at the time.

41.     Moreover, it is worth noting that the 2002 Recruiting Contract expressly listed the 13 "Deliverables" that Dolan would provide for each recruiting project under the contract.  (See Ex. A at 1.)  As revealed by a simple review of the "Deliverables," none of the 13 "Deliverables" consisted of anything even similar to

COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

the "Recruiting Desktop Procedures" and "Recruitment Process Flowchart" that Dolan would create and provide copies to CMTC nearly eight years later (in 2010).

42.    In short, the limited Recruiting Contract between the parties did not even mention these sophisticated and complex documents, much less require Dolan to create or provide to CMTC these highly valuable trade secrets.  Under the plain terms of the Recruiting Contract, CMTC was not entitled to obtain these documents or the trade secrets contained therein.  Said differently, Dolan's creation and conveyance of these highly valuable documents was outside the scope of the Recruiting Contract, as these documents were clearly not part of the consideration that Dolan was to perform under the contract.

43.    Also revealing is the fact that the Recruiting Contract did <u>not</u> contain a "Work for Hire" provision or any other provision that stated that any work, processes, programs or methods that Dolan created would be the property of CMTC.  In light of the absence of any such provision in the Recruiting Contract, CMTC simply has no basis for asserting that the highly valuable programs and methods that Dolan created and provided to CMTC are the property of CMTC.  (The Recruiting Contract did contain a provision that stated that any materials to support the program that were produced by CMTC would be CMTC's exclusive property, but the Recruiting Contract did not address materials that were <u>not</u> produced by CMTC – such as the "Recruiting Desktop Procedures" and "Recruitment Process Flowchart."  As such, both of these documents, and all of the trade secrets contained therein, are the property of Dolan.)

44.    The structure and terms of the 2002 Recruiting Contract stand in sharp contrast to the structure and terms of the Consulting Services Agreement entered into between Dolan and CMTC on June 9, 2010 (the "Consulting Contract").  A true and correct copy of the Consulting Contract is attached hereto as Exhibit G.

45.    Section 8 of the 2010 Consulting Contract, unlike the 2002 Recruiting Contract, is a "Work for Hire" provision.  It reads:

COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

The Consultant [Dolan] expressly acknowledges and agrees that any work prepared by the Consultant under this Agreement shall be considered "work for hire" and shall be the exclusive property of the Company [CMTC] unless otherwise specified in writing by the Company.  To the extent such work may not be deemed a "work for hire" under applicable law, the Consultant hereby assigns to the Company all of its right, title, and interest in and to such work.  The Consultant shall execute and deliver to the Company any instruments of transfer and take such other action that the Company may reasonably request, including, without limitation, executing and filing, at the Company's expense, copyright applications, assignments, and other documents required for the protection of the Company's rights to such materials.

(See Ex. G at 6, § 8.)

46.    The inclusion of a "work for hire" provision in the 2010 Consulting Contract only highlights the complete absence of such a provision in the 2002 Recruiting Contract.  Because both contracts were drafted by CMTC and merely presented to Dolan for his signature, any ambiguities and uncertainties must be construed against CMTC.  However, the inclusion of a "work for hire" provision in the 2010 Consulting Contract and the exclusion of such a provision in the 2002 Recruiting Contract are unambiguous and clear.

47.    Moreover, the fact that CMTC included a "work for hire" provision in the 2010 Consulting Contract demonstrates that CMTC is fully capable of including such a provision in a contract where the actual intent of the contract is to transfer ownership of all of the consultant's works to CMTC.  The fact that CMTC omitted such a provision from the 2002 Recruiting Contract conclusively demonstrates that the intent of that contract was that the works and materials that Dolan created pursuant to the contract were not to become CMTC's under the contract.

COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

48.   Of course, because Dolan provided both documents (after several months of creating the documents) to CMTC *long before* the 2010 Consulting Contract was ever entered into, the "work for hire" provision of the 2010 Consulting Contract does not govern Dolan's creation of these two works.  Indeed, Dolan actually turned these documents over to CMTC at least <u>one month</u> before the 2010 Consulting Contract was entered into.

49.   Because both of the "Recruiting Desktop Procedures" and "Recruitment Process Flowchart" contain highly valuable trade secrets that Dolan exclusively owns, CMTC is committing trade secret misappropriation by making use of these trade secrets.

<u>**CMTC Has Also Violated A Wide Array**</u>
<u>**Of Dolan's Common Law Rights**</u>

50.   In addition to its serious violations of Dolan's intellectual property rights, CMTC has also violated a wide variety of Dolan's other legal rights.  For example, from late 2009 through early 2010, CMTC repeatedly represented to Dolan (and several of his employees) that CMTC was moving forward with the landmark MLK hospital project, and that Dolan would receive commissions on each and every hire that ensued – which would likely be in the millions of dollars.

51.   At this time, the MLK hospital in Los Angeles, which had been previously shut down by the federal government for patient care violations, was in the process of re-opening.  This was a landmark event, as the MLK hospital would require re-staffing of the entire hospital, which CMTC represented to Dolan would yield over 1,000 (one thousand) new hires at all levels of staff, from administrative staff to nurses to general care doctors to specialized surgeons.

52.   Dolan created a set of core recruiting procedures and methods, which would guide the entire process of hiring the more than 1,000 employees for the MLK project.  These tasks (which were extraordinarily time-consuming and complex) were

COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

1  outside the scope of the narrow tasks Dolan was required to perform under the 2002

2  Recruiting Contract, and CMTC acknowledged this.

3       53.    Accordingly, in light of the distinct nature of this project and the unique

4  and far broader and more sophisticated services Dolan would be required to perform

5  for this project, CMTC verbally represented to Dolan that he would receive a 10%

6  commission on each new hire that was made at the MLK hospital (in contrast to the

7  formula called for by the 2002 Recruiting Contract, which fixed Dolan's commission

8  at 35% of 10% of the first year salary of the new hire, see Ex. A at 1). As a result,

9  Dolan was led to believe that he would be receiving exorbitant fees for his

10  tremendously hard work and the innovative recruiting ideas, formulas and programs

11  that he would create for this specialized project.

12       54.    CMTC made these representations via the words of Mr. Van Buren, Mr.

13  Watson, Mr. Garnee and Ms. Evans. Indeed, each one of these three individuals made

14  these very representations to Dolan, including that the MLK project was in fact

15  moving forward (without any caveats, qualifiers or doubts), that at least 1,000 new

16  hires would result from the project, and that Dolan would receive his 35%

17  commission on each of the new hires. Indeed, CMTC, through each of these

18  individuals, clearly represented that if Dolan invested the enormous time, effort and

19  money in creating the "Recruiting Desktop Procedures" and "Recruitment Process

20  Flowchart" for use in the MLK project, then Dolan would receive commissions for

21  each and every hiring made at the MLK hospital.

22       55.    At the time it made its various representations to Dolan that the landmark

23  MLK hospital project was in fact moving forward and that over 1,000 new employees

24  would need to be hired in furtherance of the project, CMTC knew that the MLK

25  hospital project had fallen through or, at best, was highly unlikely to move forward.

26  Notwithstanding this contemporaneous and actual knowledge, CMTC made the false

27  and misleading representations in order to induce Dolan to create and provide it with

28  his highly valuable and innovative "Recruiting Desktop Procedures" and

-13-

COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

1   "Recruitment Process Flowchart." (Even without the MLK project moving forward,

2   these documents would provide CMTC with incredible commercial value and cause

3   CMTC to generate significant revenue in the future by pitching and implementing

4   Dolan's innovative formulas and programs to other clients with hiring needs.)

5       56.     In reasonable and detrimental reliance on CMTC's representations,

6   Dolan spent several months of his time dedicated to this narrow project and invested

7   over $100,000 of his own money into this project (including in fees or salaries to

8   seven staff members that Dolan retained and paid). Yet, not a <u>single</u> hire came from

9   all of Dolan's efforts, time and money.

10      57.     Indeed, after Dolan spent all of his efforts, time and money developing

11  his sophisticated and creative processes and formulas, and after Dolan <u>delivered</u> to

12  CMTC these processes and formulas, CMTC informed Dolan that the MLK project

13  fell through.

14      58.     Thus, rather than providing Dolan with the significant commissions that

15  it promised at the conclusion of these services, CMTC instead commandeered and

16  misappropriated all of Dolan's creations, ideas, processes and formulas, and

17  commenced its <u>own</u> healthcare recruiting venture, while simultaneously refusing to

18  provide Dolan with a single penny in compensation.

19      59.     But for CMTC's false representations of fact, Dolan would <u>not</u> have

20  invested the time, effort and money that he did in developing these creations, ideas,

21  processes and formulas. Of course, at the time it made its false representations and

22  assurances regarding the MLK deal, CMTC knew of, or recklessly disregarded, the

23  falsity of its statements, or at the very least, made the misrepresentations negligently

24  or without reasonable basis. Rather than honestly and accurately disclosing the true

25  nature of the MLK deal to Dolan, CMTC created the false impression, and deceptively

26  led Dolan to believe, that the MLK deal was going forward and that Dolan would

27  receive significant commissions if he completed his projects.

28

-14-

COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

60.     Then, <u>after</u> it induced Dolan to spend countless hours, efforts, and dollars developing his valuable creations, ideas, processes and formulas, and <u>after</u> it convinced Dolan to share all these items of value with it, CMTC changed gears, informed Dolan that the MLK deal was off, commandeered Dolan's items of value and claimed them as its own, and then left Dolan for financial ruin – knowing that Dolan could not financially survive without receiving any commissions or revenues.

61.     Unfortunately, CMTC's actions are the epitome of a fraudulent "bait-and-switch" scheme.  Moreover, CMTC's actions make it liable to Dolan for a host of common law claims, including but not limited to promissory estoppel, fraudulent misrepresentation, negligent misrepresentation, unjust enrichment, quantum meruit or restitution, conversion and violation of Section 17200 of the California Business & Professions Code.

62.     In light of these claims, Dolan is entitled to recover from CMTC, *inter alia*, the value of the expenses, efforts and time Dolan invested in reliance on CMTC's false representations; expectancy damages, including all of the lost commissions that Dolan was promised but never provided; disgorgement of CMTC's profits that proximately flowed from its illegal and fraudulent actions; statutory restitution; and reasonable attorneys' fees and costs.

63.     Importantly, substantial evidence corroborates the facts that underlie Dolan's misrepresentation claims against CMTC.  Michelle Gordon ("Ms. Gordon"), a manager that Dolan hired specifically to oversee recruiting for the MLK project, and Kimberly Kyle ("Ms. Kyle"), the Head Nurse that Dolan specifically hired to perform recruiting for the MLK project, will both corroborate that CMTC issued the false representations regarding the MLK project and the other facts outlined above.

64.     Both witnesses will testify in this case that CMTC (via the words of Mr. Van Buren, Mr. Watson, Mr. Garnee and Ms. Evans) repeatedly and unambiguously represented to Dolan – *and to them directly* – that the very reason Dolan was to perform the large quantity of unpaid services in connection with the MLK project was

COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

because the MLK project was definitely going forward and Dolan would receive exorbitant commissions in connection with this project.  Indeed, both of these individuals were specifically hired by Dolan in order to provide services <u>for the MLK project</u> – because CMTC unambiguously led Dolan to believe that the MLK project was going forward.

65.    Both Gordon and Kyle will testify in this case to CMTC's clear misrepresentations, and the other facts outlined above.  Moreover, a plethora of emails exist between Dolan, Gordon and Kim, as well as emails from CMTC personnel, which further corroborate that CMTC made blatant misrepresentations regarding the MLK project.  In short, not only did CMTC severely violate the law with its misleading and fraudulent statements and actions in connection with the MLK project, but there is a slew of evidence that proves it.

66.    Of course, CMTC has a well-established pattern and practice of committing fraudulent and dishonest acts in operating its business – which will serve as additional corroborating evidence of its fraudulent and dishonest acts towards Dolan.

67.    For example, CMTC had a pattern and practice of illegally and secretly recording meetings that CMTC attended, without notifying the other attendees to the meeting.  Indeed, Michelle Evans would direct Janett Ramos, Ms. Evans' assistant, to use her iPhone to record meetings between CMTC and outside vendors, counterparties to contracts and parties with whom CMTC was negotiating for potential contracts.  Apart from being secretive and dishonest, CMTC's conduct constitutes a clear violation of federal and state wiretap laws.  Dolan, Kimberly Kyle and several other individuals within CMTC will testify to this fact.  Indeed, Ms. Ramos, herself, will testify to this fact, assuming she does not perjure herself before the Court.  In a particularly egregious instance of illegal wiretapping, CMTC actually secretly recorded a 2010 business meeting between CMTC and government employees from the Los Angeles County Department of Health Services.  That CMTC would have the

COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

1  audacity (and dishonesty) to secretly wiretap government officials without their

2  knowledge is indicative of CMTC's lack of business ethics and dishonesty, and

3  further supports Dolan's claims regarding CMTC's dishonest and manipulative

4  conduct.

5      68.    In another indicative example, the United States Department of

6  Commerce, Office of Inspector General, recommended in July 2010 that $11,384,182

7  in questioned CMTC costs be disallowed and that $3,794,349 in excess federal funds

8  be recovered from CMTC.  CMTC's actions in that instance further corroborate

9  CMTC's pattern and practice of dishonest and fraudulent conduct.

10     69.    Furthermore, CMTC's dishonest and fraudulent acts towards Dolan in

11  this case are further corroborated by CMTC's long-established practice of committing

12  fraudulent marketing and advertising acts and of deceiving potential clients in order to

13  obtain their business.  For example, CMTC's website currently proclaims that it has

14  been providing recruiting services in the healthcare industry since 1994.  This

15  representation is demonstrably false and fraudulent, as CMTC is well aware.

16     70.    Further still, CMTC applied illegal hiring practices to positions tied to

17  government funding.  For example, and as Kimberly Kyle will testify in this case, Mr.

18  Garnee stated in a staff meeting in approximately May 2010 that certain hospitals in

19  particular communities will demand that CMTC openly discriminate and only recruit

20  black, Hispanic or other minority nurses.  Mr. Garnee further stated that he did this in

21  the past when he was working with Spherion on behalf of Prudential, and that CMTC

22  should also do this if it is going to keep the hospital's business.  Ms. Kyle was

23  shocked and unnerved by the fact that a Director of Human Resources would openly

24  encourage staff to discriminate by race, particularly with respect to hirings that were

25  tied to federal funding.

26     71.    Moreover, CMTC committed illegal and deceptive acts of nepotism in

27  connection with hiring, including by insisting that Michelle Evans' daughter be

28  employed in a position for which she was not qualified, rather than filling the position

-17-

COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

1   with one of the countless qualified applicants.  CMTC nevertheless created the false

2   impression that it was conducting an open and legitimate search for the position,

3   which is further evidence of CMTC's *modus operandi* of committing fraudulent and

4   deceptive actions in operating its business.

5       72.    Via discovery in this case, Dolan will also inquire into the highly unusual

6   relationship between CMTC and CMTC HC LLC.  On information and belief, it

7   appears that CMTC (and Messrs. Van Buren, Watson and Garnee) created a for-profit

8   LLC as an arm of the non-profit CMTC, and that certain revenues are being

9   strategically funneled between the entities, very likely in a deceptive and fraudulent

10  manner under the law.

11      73.    Apparently not content in committing the widespread legal violations

12  above, CMTC has committed additional legal violations that have materially and

13  adversely impacted Dolan's business reputation and operations.

14      74.    In approximately November 2010, Dolan was contacted by Nora Cortez

15  ("Ms. Cortez"), the Human Resources Director of TST Metals ("TST"), a metal

16  foundry company in Fontana, California.  TST was in need of making certain new

17  hires, so it entered into a verbal recruiting contract with Dolan (as is standard in the

18  industry in these sorts of situations).  Under the verbal agreement, Dolan would locate

19  and provide resumes of candidates to TST, and TST would pay Dolan a fee of 10% of

20  the first year salary of the employees who were hired by TST.

21      75.    After Dolan began searching for, collecting and forwarding on resumes

22  to TST, Kevin Kojian ("Mr. Kojian"), a Senior Account Manager at CMTC,

23  independently contacted Ms. Cortez regarding another matter.  During that

24  conversation, Mr. Kojian learned that Dolan was providing recruiting services to TST.

25  Mr. Kojian subsequently represented to Ms. Cortez, on behalf of CMTC and Mr.

26  Watson and Mr. Garnee (to whom Mr. Kojian reported), that Dolan did not create the

27  HIRE FOR SUCCESS mark and that Dolan was illegally using the mark that CMTC

28

COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

exclusively created. As a result of these representations, Ms. Cortez contacted Dolan and cancelled his contract with TST.

76.    Mr. Kojian's and CMTC's plainly false representation materially damaged Dolan's business reputation, and contractual and business relationship with TST, and thereby caused Dolan to incur a loss of revenue that he would not have incurred but for the false representations.

## PUNITIVE DAMAGES ARE WARRANTED IN THIS CASE

77.    Based on CMTC's, Mr. Van Buren's, Mr. Watson's and Mr. Garnee's willful, malicious and fraudulent actions – as outlined above – an award of punitive damages is necessary to punish these Defendants for their truly bad faith actions, and to deter them from committing similar actions in the future.

78.    These Defendants have acted wantonly and with conscious disregard of the rights of Dolan, and have committed clear acts of fraud and deception, as explained in detail above, towards Dolan in violating his legal rights. Accordingly, punitive damages against these Defendants are warranted.

## NO ARBITRATION AGREEMENT
## CONTROLS THIS DISPUTE

79.    This case was properly initiated in this Court. To the extent that CMTC asserts that this action should have been initiated in arbitration, rather than Court, CMTC would be wrong. No arbitration agreement controls this dispute.

80.    Indeed, the 2002 Recruiting Contract contains no arbitration provision. Moreover, the 2010 Consulting Contract, which contains an arbitration provision, does not govern this litigation because the acts and omissions at issue in this lawsuit occurred before the 2010 Consulting Agreement was entered into.

81.    Consequently, to the extent that CMTC moves to compel arbitration of this dispute, CMTC's motion should be denied.

-19-

COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

82.     Dolan lastly notes that on or about August 9, 2012, CMTC filed a Petition for Cancellation of both the HIRE FOR SUCCESS and HEALTHCARE HIRE FOR SUCCESS trademarks in the United States Patent and Trademark Office, Trademark Trial and Appeal Board (the "TTAB Action").  Dolan has registered trademarks for both of these marks, bearing registration numbers 3,976,062 and 3,976,068, respectively.

83.     While CMTC's Petition for Cancellation is factually and legally baseless, Dolan's position is that it would be appropriate and prudent for the TTAB Action to be stayed pending the resolution of this federal action.  Not only does this federal case involve far broader legal rights and issues than does the TTAB Action, but the ruling of this Court would be binding upon the TTAB, while any ruling issued by the TTAB would not be binding upon this Court.

# FIRST CAUSE OF ACTION
## TRADEMARK INFRINGEMENT
### (Brought Against All Defendants)

84.     Dolan realleges and incorporates by reference every allegation contained in this Complaint as though fully set forth in this paragraph.

85.     Dolan owns a protectable trademark in the HIRE FOR SUCCESS mark for the detailed reasons provided above in paragraph 14 through 33.  Indeed, Dolan conceived of and created the mark, and was the first (by far) to use the mark openly and actively in commerce.  Dolan has continually and openly used the mark in commerce since 2001, after having first developed the mark internally in 1998.

86.     Moreover, for the reasons set forth in paragraph 34 above, Dolan owns a protectable trademark in the HEALTHCARE HIRE FOR SUCCESS mark.

87.     In addition, Dolan has federally registered trademarks in both the HIRE FOR SUCCESS and HEALTHCARE HIRE FOR SUCCESS marks, bearing registration numbers 3,976,062 and 3,976,068, respectively.

88.     Notwithstanding that Dolan owns these protectable trademarks, CMTC and the other Defendants are making open and unauthorized use of these trademarks, in violation of the Lanham Act.

89.     As a result thereof, consumers are being, or likely being, confused as to the origin of the mark and the company that is truly associated with the mark. Defendants' actions are also causing Dolan material financial injuries, in an amount to be proven at trial.

90.     Dolan also requests an award of restitution or disgorgement, such that all of the ill-gained profits Defendants have generated through infringing Dolan's trademarks be turned over to Dolan.

91.     Accordingly, Dolan is entitled to a declaration that both of these marks are his trademarks (and not Defendants'), and an injunction prohibiting Defendants from continuing to use Dolan's trademarks.  Moreover, because Dolan's trademarks are federally registered, an award of attorney's fees is also warranted.

## SECOND CAUSE OF ACTION
## TRADE SECRET MISAPPROPRIATION
### (Brought Against All Defendants)

92.     Dolan realleges and incorporates by reference every allegation contained in this Complaint as though fully set forth in this paragraph.

93.     As outlined in detail in paragraphs 35 to 49 above, Dolan is the rightful owner of the trade secrets contained in the "Recruiting Desktop Procedures" and "Recruitment Process Flowchart."  Dolan spent several months and significant resources developing the highly sophisticated and detailed processes, methods and programs for obtaining ultimate recruiting success that are contained in these documents.  (See Exs. E and F.)

94.     Dolan exclusively created both documents (and all of their content) and subsequently presented them to CMTC.  Both documents are raft with highly

COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

1   sophisticated, creative and commercially valuable information, processes and systems

2   – all of which were exclusively created by Dolan after months of intensive and costly

3   efforts.

4       95.    The information, processes and systems contained in both documents

5   carry independent economic value (actual or potential) as a result of not being

6   generally known to the public, since both documents contain sophisticated, innovative

7   and creative ideas, formulas and programs for obtaining recruiting success.

8       96.    Moreover, Dolan made reasonable efforts to maintain the secrecy of the

9   information, processes and systems, by not disclosing them to anyone other than

10  CMTC in furtherance of their business relationship.

11      97.    Accordingly, the formulas, programs and methods contained in the

12  documents constitute trade secrets.

13      98.    Because Defendants are making use of the trade secrets in its recruiting

14  operations, Defendants are misappropriating Dolan's trade secrets.  As such, Dolan is

15  entitled to a declaration clarifying that Dolan owns the trade secrets, an injunction

16  prohibiting Defendants from making any use of the trade secrets, monetary damages

17  reflecting the financial injuries Dolan has incurred as a result of Defendants' trade

18  secret misappropriation (in an amount to be proven at trial), and restitution or

19  disgorgement of all of the ill-gotten profits that Defendants have generated through

20  the misappropriation of Dolan's trade

21

22              **THIRD CAUSE OF ACTION**

23              **PROMISSORY ESTOPPEL**

24          **(Brought Against All Defendants)**

25      99.    Dolan realleges and incorporates by reference every allegation contained

26  in this Complaint as though fully set forth in this paragraph.

27      100.   Defendants, and each of them, made false and misleading representations

28  to Dolan in connection with the MLK project, including that the project was definitely

-22-

COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

going forward (without caveats, qualifications or limitations), that the project would yield over 1,000 new hires that generate a recruiting commission, and that Dolan would receive 10% of the first year salary of each such new hire. In the end, it was revealed that the MLK project was not going forward, and CMTC simply obtained copies of Dolan's highly sophisticated and valuable trade secrets – without any compensation.

101. In direct and reasonable reliance on Defendants' false representations, Dolan spent significant time, effort and resources creating the "Recruiting Desktop Procedures" and the "Recruitment Process Flowchart" – and then decided to turn over copies of these highly valuable documents to CMTC.

102. Stunningly, Defendants now believe that they somehow have legal ownership over those trade secrets, simply because Dolan provided copies to them in reliance on their materially false representations. (Of course, although Dolan provided copies to Defendants in reasonable reliance on their false representations, Dolan never transferred, conveyed or assigned ownership of the trade secrets to Defendants.)

103. However, apart from the fact that Dolan is the rightful owner of the trade secrets contained in these documents, Dolan created and provided <u>copies</u> of those documents to Defendants in justifiable and reasonable reliance on Defendants' false statements. But for Defendants' false representations, Dolan would not have created and turned over copies of the documents to CMTC.

104. Dolan has suffered significant monetary injuries, in an amount to be proven at trial, in direct reliance on Defendants' false representations.

///
///
///
///
///

-23-

# FOURTH CAUSE OF ACTION

## FRAUD OR DECEIT

### (Brought Against All Defendants)

105.   Dolan realleges and incorporates by reference every allegation contained in this Complaint as though fully set forth in this paragraph.

106.   Defendants, and each of them, made false and misleading representations to Dolan in connection with the MLK project, including that the project was definitely going forward (without caveats, qualifications or limitations), that the project would yield over 1,000 new hires that generate a recruiting commission, and that Dolan would receive 10% of the first year salary of each such new hire.  In the end, it was revealed that the MLK project was not going forward, and CMTC simply obtained copies of Dolan's highly sophisticated and valuable trade secrets – without any compensation.

107.   At the time that Defendants issued these representations, they knew of, or consciously or recklessly disregarded, the falsity of the representations.  Indeed, they knew that the CMTC was not going to be moving forward with the MLK project, or at least consciously or recklessly disregarded the risk that CMTC would not be moving forward with the project.  Nevertheless, Defendants made clear and unqualified representations to Dolan that the project would be going forward.

108.   In direct and reasonable reliance on Defendants' false representations, Dolan spent significant time, effort and resources creating the "Recruiting Desktop Procedures" and the "Recruitment Process Flowchart" – and then decided to turn over copies of these highly valuable documents to CMTC.  But for Defendants' false representations, Dolan would not have created and turned over copies of the documents to CMTC.

109.   Stunningly, Defendants now believe that they somehow have legal ownership over those trade secrets, simply because Dolan provided copies to them in reliance on their materially false representations.  (Of course, although Dolan

-24-

provided copies to Defendants in reasonable reliance on their false representations, Dolan never transferred, conveyed or assigned ownership of the trade secrets to Defendants.)

110.    Dolan has suffered significant monetary injuries, in an amount to be proven at trial, in direct reliance on Defendants' false representations.

111.    As alleged herein, Defendants, and each of them, made the numerous false and misleading statements identified throughout the Complaint.  As explained herein, each of these statements were false.

112.    At the time these Defendants, and each of them, made these statements, they knew or recklessly disregarded the falsity of their statements, and had the intent of inducing Dolan into relying upon their false statements.  Dolan reasonably and detrimentally relied upon Defendant's false representations by making certain payments to the Defendants and foregoing or waiving certain rights.

113.    Dolan has suffered significant economic damages as a proximate result of these fraudulent actions, in an amount to be proven at trial.

114.    Moreover, in light of Defendants' deliberate and willful acts of fraud, an award of punitive damages is warranted.

## FIFTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION
**(Brought Against All Defendants)**

115.    Dolan realleges and incorporates by reference every allegation contained in this Complaint as though fully set forth in this paragraph.

116.    Defendants, and each of them, made false and misleading representations to Dolan in connection with the MLK project, including that the project was definitely going forward (without caveats, qualifications or limitations), that the project would yield over 1,000 new hires that generate a recruiting commission, and that Dolan would receive 10% of the first year salary of each such new hire.  In the end, it was

COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

revealed that the MLK project was not going forward, and CMTC simply obtained copies of Dolan's highly sophisticated and valuable trade secrets – without any compensation.

117.   At the time that Defendants issued these representations, they reasonably should have known that the representations were false, or Defendants made the representations without reasonable factual support.  Indeed, at the time of the representations, Defendants at the very least knew there was a risk that the MLK project would not move forward, yet they failed to disclose this risk to Dolan or qualify their representations in any way.  (The allegations of Defendants' mental intent in this Cause of Action are pled in the alternative to the allegations of mental intent pled in the preceding Cause of Action.)  Despite their actual knowledge of the uncertainty of the project moving forward, Defendants nevertheless made clear and unqualified representations to Dolan that the project would be going forward.

118.   In direct and reasonable reliance on Defendants' false representations, Dolan spent significant time, effort and resources creating the "Recruiting Desktop Procedures" and the "Recruitment Process Flowchart" – and then decided to turn over copies of these highly valuable documents to CMTC.  But for Defendants' false representations, Dolan would not have created and turned over copies of the documents to CMTC.

119.   Stunningly, Defendants now believe that they somehow have legal ownership over those trade secrets, simply because Dolan provided copies to them in reliance on their materially false representations.  (Of course, although Dolan provided copies to Defendants in reasonable reliance on their false representations, Dolan never transferred, conveyed or assigned ownership of the trade secrets to Defendants.)

120.   Dolan has suffered significant monetary injuries, in an amount to be proven at trial, in direct reliance on Defendants' false representations.

COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

## SIXTH CAUSE OF ACTION

### CONVERSION

### (Brought Against All Defendants)

121.   Dolan realleges and incorporates by reference every allegation contained in this Complaint as though fully set forth in this paragraph.

122.   At all times alleged herein, Dolan was the owner of the highly valuable property contained in the "Recruiting Desktop Procedures" and "Recruiting Process Flowchart," yet Defendants unlawfully obtained or took this property from Dolan, by making the false and manipulative representations outlined throughout this Complaint.

123.   In so doing, Defendants took Dolan's property without permission or authorization, for their own personal and wrongful use.  Defendants, and each of them, were direct beneficiaries of the conversion as they obtained financial benefits therefrom.

124.   As a legal result of the conversion by Defendants, Dolan has suffered damages, including but not limited to, the fair market value of the converted property (i.e., the "Recruiting Desktop Procedures" and "Recruiting Process Flowchart"). Moreover, Defendants must be ordered to turn over all profits or revenues they have generated through their use of the converted property.

125.   By so deliberately, wantonly, maliciously and fraudulently converting this property from Dolan, Defendants are also liable for punitive damages.

## SEVENTH CAUSE OF ACTION

### UNJUST ENRICHMENT / QUANTUM MERUIT / RESTITUTION

### (Brought Against All Defendants)

126.   Dolan realleges and incorporates by reference every allegation contained in this Complaint as though fully set forth in this paragraph.

127.   By using Dolan's trademarks and trade secrets, and by obtaining Dolan's "Recruiting Desktop Procedures" and "Recruitment Process Flowchart," Defendants

COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

1  have obtained substantial benefit, without paying reasonable compensation for the

2  value of these benefits.

3       128.  It would be unjust and inequitable to allow Defendants to retain these

4  benefits without paying the reasonable value of the benefits.

5       129.  Accordingly, Defendants should be ordered to turn over or disgorge any

6  and all of the benefits it has derived from its wrongful and inequitable actions, and

7  Dolan should be compensated by Defendants for the reasonable and fair market value

8  of his efforts in connection with the conveyance of the benefits that Defendants

9  wrongfully acquired.

10

11            **EIGHTH CAUSE OF ACTION**

12    **TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

13      **(Brought Against Defendants CMTC, Mr. Watson and Mr. Garnee)**

14       130.  Dolan realleges and incorporates by reference every allegation contained

15  in this Complaint as though fully set forth in this paragraph.

16       131.  In approximately November 2010, Dolan was contacted by Nora Cortez

17  ("Ms. Cortez"), the Human Resources Director of TST Metals ("TST"), a metal

18  foundry company in Fontana, California.  TST was in need of making certain new

19  hires, so it entered into a verbal recruiting contract with Dolan (as is standard in the

20  industry in these sorts of situations).

21       132.  Under the verbal contract, Dolan would locate and provide resumes of

22  candidates to TST, and TST would pay Dolan a fee of 10% of the first year salary of

23  the employees who were hired by TST.  This verbal contract was a binding and valid

24  legal agreement.

25       133.  After Dolan began searching for, collecting and forwarding on resumes

26  to TST, Kevin Kojian ("Mr. Kojian"), a Senior Account Manager at CMTC,

27  independently contacted Ms. Cortez regarding another matter.  During that

28  conversation, Mr. Kojian learned that Dolan and TST had entered into a recruiting

-28-                          COMPLAINT FOR DAMAGES,
                             DECLARATORY AND INJUNCTIVE RELIEF

contract.  Mr. Kojian subsequently represented to Ms. Cortez, on behalf of CMTC and at the direction of Mr. Watson and Mr. Garnee (to whom Mr. Kojian reported), that Dolan did not create the HIRE FOR SUCCESS mark and that Dolan was illegally using the mark that CMTC exclusively created.

134.    As a result of these representations, Ms. Cortez contacted Dolan and cancelled his contract with TST.  Mr. Kojian's and CMTC's plainly false representation materially interfered with and damaged Dolan's existing business contract with TST.  These representations did, in fact, induce a disruption, interference, breach or damage to Dolan's existing contract with TST, a contract of which CMTC was plainly aware.

135.    As a result of Mr. Kojian's and CMTC's acts of interference with the TST contract, Dolan incurred monetary and revenue losses in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

### DEFAMATION

### (Brought Against Defendants CMTC, Mr. Watson and Mr. Garnee)

136.    Dolan realleges and incorporates by reference every allegation contained in this Complaint as though fully set forth in this paragraph.

137.    Dolan hereby specifically incorporates by reference the factual allegations contained in the Eighth Cause Of Action, above, and asserts that such allegations and factual occurrences also support a claim for defamation.

138.    The statement that CMTC and Mr. Kojian (at the direction of Mr. Watson and Mr. Garnee) published to a third party, TST, was false.  Contrary to the statement published by CMTC and Mr. Kojian, Dolan did, in fact, create the HIRE FOR SUCCESS mark and was the first to use the mark in commerce.

139.    The statements unambiguously concerned Dolan, as they expressly referenced him by name.

-29-                                COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

140.   The statements were objectively false.

141.   The statements tend to harm, and in fact harmed and damaged, Dolan's business reputation.

142.   Consequently, these Defendants are liable for defamation, and Dolan is entitled to money damages to compensate him for the injuries he incurred as a result thereof.  Dolan also seeks an injunction ordering these Defendants not to republish the same defamatory statements in the future.

## TENTH CAUSE OF ACTION

## VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200 ET SEQ., UNLAWFUL, FRAUDULENT AND UNFAIR BUSINESS ACTS AND PRACTICES

### (Brought Against All Defendants)

143.   Dolan realleges and incorporates by reference every allegation contained in this Complaint as though fully set forth in this paragraph.

144.   The acts and conduct of Defendants as alleged throughout this Complaint, and in each cause of action above, constitute predicate unlawful, unfair and fraudulent business acts and practices, and thereby violate Section 17200 et seq. of the California Business & Professions Code.

145.   As a proximate result of Defendants' unlawful, unfair and fraudulent business acts and practices, Dolan has incurred substantial damages.

146.   Accordingly, Dolan is entitled to equitable relief, including restitution of all sums of money wrongfully obtained by Defendants, and any other appropriate relief authorized by Section 17200 et seq. of the California Business & Professions Code.

///

///

///

COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

**WHEREFORE**, Dolan prays for judgment as follows:

1.    For permanent injunctive relief restraining and enjoining Defendants, their managers, servants, agents, officers, employees, and all other persons acting on their behalf and/or at their direction, from making any use of Dolan's trademarks, HIRE FOR SUCCESS and HEALTHCARE HIRE FOR SUCCESS, and from making any use of Dolan's trade secrets, which are contained within the "Recruiting Desktop Procedures" and "Recruitment Process Flowchart" that Dolan created;

2.    For a declaration that all of Dolan is the rightful owner of the HIRE FOR SUCCESS and HEALTHCARE HIRE FOR SUCCESS marks, that Dolan is the rightful owner of the trade secrets contained within the "Recruiting Desktop Procedures" and "Recruitment Process Flowchart" that Dolan created, and that the Defendants have committed violations of the various common laws and statutes outlined above;

3.    For compensatory and actual damages based on Defendants' widespread violations of law, in an amount to be proven at trial;

4.    For consequential damages, based on all injuries and losses that proximately flowed from Defendants' violations of law, including the substantial lost income and profits suffered by Dolan as a result of Defendants' widespread violations of law, in an amount to be proven at trial;

5.    For punitive and exemplary damages based on Defendants' willful, malicious, wanton and fraudulent misconduct, in an amount according to proof at trial;

6.    For disgorgement of any and all ill-gotten profits or revenues Defendants have generated as a result of their widespread violations of law, including but not limited to any and all profits or revenues Defendants have generated through the use of Dolan's trademarks or trade secrets;

7.    For restitution, according to Cal. Bus. & Prof. Code § 17200 *et. seq.*;

8.    For pre- and post-judgment interest;

COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

9.    For the reasonable attorneys' fees and costs that Dolan has been forced to incur in filing and prosecuting this suit; and

10.    For any such further relief that the Court deems just and proper.

## **DEMAND FOR A JURY TRIAL**

Dolan demands a jury trial on all causes of action triable by jury.

Dated:  September 27, 2012                    NEXUS LAW GROUP, LLP

By_____

Jarrett A. Green

*Attorneys for Plaintiffs*
*James Dolan, The FaceTime Group, Inc.,*
*and FaceTime Recruiters, Inc.*

COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE RELIEF

**EXHIBIT A**



## CALIFORNIA MANUFACTURING TECHNOLOGY CENTER

May 1, 2002

Mr. James Dolan
The Face Time Group
200 Avenue G, Suite 108
Redondo Beach, CA 90277

Dear James:

This Letter of Agreement defines the Recruitment Processes and the working relationship between The Face Time Group, (as a non exclusive associate), and California Manufacturing Technology Center (CMTC).

### Pricing

CMTC's recruitment services are 10% of the successful candidates annual salary with a $5,000 minimum.

### Associate Fee

CMTC will pay The Face Time Group 35% of the total final fee for the recruitment service. This fee will be paid upon the successful placement of a candidate (candidate accepts offer, passes client's internal tests, and reports to work).

### Recruitment Areas

CMTC will recruit for the following job classifications:

- Administration
- Accounting
- Customer Service
- Human Resources
- Information Systems
- Marketing
- Plant Management
- Quality Control
- Sales
- Shipping/Receiving

### The Face Time Group's Deliverables Per Project are as follows: (see attached for details)

- Review and confirm (signed by client) job description and pay range.
- Collect and review resumes.
- Conduct telephone and face to face screening and interviews at a mutually agreed upon location.
- Present a minimum of 3 initial candidates, meeting the job description and pay range.
- Brief CMTC project manager of candidates and rationale for selection prior to joint presentation to client.
- Coordinate interviews with client and CMTC.
- Be available to discuss candidate qualifications with client and CMTC before and after interviews.
- Debrief CMTC after each interview via written communication (i.e. email).
- Participate in milestone meetings called by CMTC project manager.
- Milestone meetings are required once 3 candidates have been rejected by the client. CMTC's project manager and a Face Time Group representative will attend (if needed).
- Provide candidates (max. 10) until recruitment is completed (additional candidates as needed).
- Insures CMTC meets the final candidate.
- Counsel with client to facilitate negotiations and preparation of offer (if required).

*CMTC Headquarters*: 1149 West 190th Street, Suite 2014 • Gardena, California 90248 • 310.263.3060 • fax: 310.263.3062

*Regional Centers: Los Angeles • Orange County • Inland Empire • San Diego / Imperial County
Ventura / Santa Barbara County • San Joaquin Valley • San Fernando / San Gabriel Valley*

### Payment Terms

#### CMTC and Client

- A 25% Down Payment is required.
- The remainder of the fee is billed at the completion of the recruitment.
- CMTC customers will pay CMTC net 30 days with no prompt pay discount.

#### CMTC and The Face Time Group

- The Face Time Group will invoice CMTC net 30 days after completion of project.

#### Client Interaction

- All Letters of Agreement (Proposals) and contracts will be developed by CMTC and delivered by CMTC with a representative of The Face Time Group (if required).
- All contact with a client will be directed through the CMTC account or project manager.
- All fee discussions with the client will be handled by CMTC.
- A 10 candidate maximum has been established. However, until we develop a track record CMTC, and The Face Time Group will do all possible to insure a successful recruitment. As a result, for the first 5 recruitments, the maximum does not apply.

### Recruitment Guarantee

CMTC has a 90 day guarantee to it's clients. Therefore, The Face Time group has the same 90 day guarantee to CMTC. As a result, both The Face Time Group and CMTC will repeat (at no additional cost) the recruitment process should a candidate not continue employment for 90 days from the actual start date.

### Temporary Money Back Guarantee

Until CMTC can establish a reputation for recruiting, a money back guarantee (return of down payment) will be offered. This will occur for the first 5 recruitments. For subsequent recruitments the money back guarantee will be removed. The Face Time Group will also participate in this guarantee for the initial 5 recruitments.

### Non-Compete

During the period that this Agreement is in effect and after termination of this Agreement for any reason, The Face Time Group agrees that they shall not, directly or indirectly, either individually or as an employee, consultant, advisor, creditor, independent contractor, agent, partner, co-venturer, officer, director, shareholder or otherwise of or through any corporation, partnership, association, joint venture, firm or otherwise, or in any other capacity, promote, participate or engage in or work with or for any business, enterprise or other endeavor which is competitive with the business and/or activities of CMTC within the trade area of CMTC.

### Cancellation

CMTC can cancel this Agreement on 30 days notice.

All materials to support the recruitment program will be produced by CMTC and are the exclusive property of CMTC. Changes to the program must be reviewed and approved, in writing, by the CMTC SBS Practice Leader.

The parties further agree that this agreement represents the final, complete and exclusive expression of their agreement, and shall be effective only upon full execution by the parties. Changes to this agreement must be done in writing upon mutual approval. This agreement can only be executed by an authorized officer/agent of the parties.

James Watson
VP Consulting Service
CMTC

James Dolan
President
The Face Time Group

**EXHIBIT B**



# HIRE FOR SUCCESS

FINDING
TOMORROW'S
LEADERS TODAY!



The Face Time Group



## FEE SCHEDULE

Annual Salary          Placement Fee

**$30,000.00 & UP        10%**

(Minimum Service Fee: $3,000.00)

## GUARANTEE

All FTG Candidates placed with our clients are assured with a **90-Day free replacement policy.**

We promise a 90-Day free replacement if the candidate leaves our client's employment for any reason.

## FTG TAKES THE LEADERSHIP ROLE

Our experience in the Manufacturing Industry makes FTG a value added service company. This is why we can recruit in a shorter time period and pass the savings on to our customers. We understand their business.

Our manufacturing experience gives us the ability to lower our fees, therefore to be more flexible with clients.

Succeeding in tomorrow's marketplace depends upon a company's ability to choose the right candidates today. We provide our clients with a competitive edge by identifying outstanding candidates with tomorrow's critical and strategic skills. We don't just find people, we find the best people.

### Our Mission—

Is to provide our clients with fundamental services that consistently out perform the industry standards in retained and contingency search alternatives.



### Our Goal—

Is to provide our customers the ability to identify, hire and retain the best available candidates for their most critical organizational requirements.

### The Face Time Group

**www.getfacetime.com**
Available 24 hours a day!
Toll Free 866.544.3223
Email: dolan@getfacetime.com

©2001 The FaceTime Group

# HOW TO HIRE FOR SUCCESS



**1  Job Order & Position Parameters:** We begin each search by meeting with our client to establish the required qualifications, responsibilities, reporting relationships and expectations of the position. The FTG Representative will then place your Job Requisition Order with our recruiting staff.

**2  Candidate Sourcing:** Our experienced research staff and consultants develop a unique database of potential candidates for each search according to the position parameters: requirements, skills, salary range and candidate's career goals.

**3  Candidate Screening:** Our search consultants screen potential candidates by telephone to determine suitability to the position. We then meet with our most qualified (top) candidates for face-to-face interviews.

**4  Client/Candidate Interviews:** FTG will coordinate between our clients and a select group of highly qualified candidates, FTG will present only those candidates who are qualified. Thus expediting the hiring cycle.

**5  Hire, Follow-up & Guarantee:** Once a suitable candidate is selected by our client, FTG will assist in the offer to the candidate. Upon acceptance of the offer FTG will provide our clients a 90-Day free replacement guarantee.

## OUR MANUFACTURING INDUSTRY EXPERTISE

- **OPERATIONS & DISTRIBUTION**
- **SENIOR MANAGEMENT**
- **PLANT/LINE MANAGERS**
- **ENGINEERING**
- **INFORMATION TECHNOLOGY**
- **QUALITY CONTROL**
- **PURCHASING /INVENTORY CONTROL**
- **SALES /MARKETING**
- **TECHNICIANS & MACHINE OPERATORS**
- **ACCOUNTING & ADMINISTRATION**

Our dedicated team of Account Managers and Recruiters can be retained as a single point of contact or you may opt for an on-site recruiter.

**Some Benefits Include:**

1  Dedicated Account Managers & Recruiters

2  On-Site Candidate Assessment

3  Reduced Job Requisition Life Cycle based on our experience with the manufacturing industry.



FTG can offer the manufacturing consulting services of California Manufacturing Technology Consulting Group in the area of :

- *LEAN MANUFACTURING*
- *ISO/QUALITY SYSTEMS*
- *DISTRIBUTION SERVICES*

*Covering All Manufacturing Industries!*

**EXHIBIT C**

# The Face Time Group

200 Ave G Suite 108
Redondo Beach, CA. 90277
310-944-9228

**Invoice No. 100-1001**

## INVOICE

### Customer

| | |
|---|---|
| Name | Santec Faucets-Nick Chen CEO |
| Address | 3501 Challenger |
| City | Torrance    State Ca    ZIP 90503 |
| Phone | 310-370-5990 |

| | |
|---|---|
| Date | 8/7/2001 |
| Order No. | PO 81817 |
| Rep | |
| FOB | |

| Unit | Description | Unit Price | TOTAL |
|---|---|---|---|
| 1 | Hire For Success Placement Yuri Burkman | $2,800.00 | $2,800.00 |

***************SECOND NOTICE*********************

Terms: Due Upon Receipt

| | | |
|---|---|---|
| | SubTotal | $2,800.00 |
| | | |
| | **TOTAL** | $2,800.00 |

### Payment Details

- O  Cash
- ◉  Check
- O  Credit Card

Name _____
CC # _____
          Expires _____

Off

*Hire for Success*

*Finding Tomorrow's Leaders Today!*

**EXHIBIT D**

SANTEC, INC

| ACCOUNT NO. | | | VENDOR | | CHECK NO. 013473 | CHECK DATE 08/21/01 | 13473 |
| VOUCHER | INVOICE NUMBER | INV. DATE | REFERENCE | INVOICE AMOUNT | AMOUNT PAID | DISCOUNT TAKEN | NET CHECK AMOUNT |
|---|---|---|---|---|---|---|---|
| 2001-100-1 | 08/01/01 | Yurj B. | 01-THEFACE | 2,800.00 | | .00 | 2,800.00 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | CHECK TOTAL | 2,800.00 |

SANTEC, INC.
3501 CHALLENGER STREET
TORRANCE, CALIFORNIA 90503

UNION BANK OF CALIFORNIA
15600 SOUTH WESTERN AVE., GARDENA, CA 90247
16-48/1220

| CHECK NO. | CHECK DATE | VENDOR NO. |
|---|---|---|
| 013473 | 08/21/01 | 01-THEFACE |

PAY

*TWO THOUSAND EIGHT HUNDRED DOLLARS AND NO CENTS

CHECK AMOUNT
******2,800.00*

TO THE
ORDER
OF:
THE FACE TIME GROUP
200 AVENUE G, SUITE 108
REDONDO BEACH CA 90277

SANTEC, INC.

AUTHORIZED SIGNATURE

⑈013473⑈ ⑊122000496⑊ 103003848 3⑈

**EXHIBIT E**

# EXHIBIT E

# TO BE FILED
# UNDER SEAL

**EXHIBIT F**

# EXHIBIT F

# TO BE FILED UNDER SEAL

**EXHIBIT G**

**FaceTime Health Partners**
**CONSULTING SERVICES AGREEMENT**

This Consulting Services Agreement (hereinafter referred to as the "Agreement") is
entered into as of June 9, 2010 (hereinafter referred to as the "Effective Date") by and
between **FaceTime Health Partners**, a Delaware Corporation (hereinafter referred to as
the "Consultant"), and California Manufacturing Technology Consulting, a California
Corporation (hereinafter referred to as the "Company"), and (collectively hereinafter
referred to as the "Parties").

### RECITALS

**WHEREAS**, the Company is engaged in the business of providing Lean
Healthcare Services in addition to providing staffing and retention training programs for
California Hospitals, medical facilities, and the Healthcare sector;

**WHEREAS**, the Company wishes to engage the Consultant as an independent
contractor for the purpose of providing the professional services set forth in Exhibit A
and Exhibit C, (hereinafter referred to as the "Services"), such exhibits are attached
hereto and made a part hereof, on the terms and conditions set forth below;

**WHEREAS**, the Consultant wishes to provide to the Company the Services in
accordance with the terms of this Agreement; and

**WHEREAS**, each Party is duly authorized and capable of entering into this
Agreement.

**NOW THEREFORE**, in consideration of the above recitals and the mutual
promises and benefits contained herein, the Parties hereby agree as follows:

1.    **RECITALS.** The Recitals set forth above are incorporated herein as if fully
      set forth herein.

2.    **RESPONSIBILITIES.**

      (a)    <u>Of the Consultant</u>. The Consultant agrees to do each of the following:

             A.  Perform the Services set forth in Exhibit A and Exhibit C attached
                 hereto; provided, however, if a conflict exists between this Agreement
                 and any term in Exhibit A and/or Exhibit C, the terms in this
                 Agreement shall control.
             B.  Use its best efforts, skills and abilities and devote as much productive
                 time, energy, and ability to the efficient performance of its duties
                 hereunder as may be necessary to provide the required Services in a
                 timely and productive manner.

C. Perform the Services in a safe, good, and workmanlike manner with the highest degree of professional competency by fully-trained, skilled, competent, and experienced personnel using at all times adequate equipment in good working order.

D. Communicate with the Company regarding progress the Consultant has made in performing the Services, through Reports as described in Section 7 and other reasonable methods approved by the Company.

E. Provide Services that are subject to the continuing satisfaction, acceptance and approval of the Company.

F. Not to engage nor solely represent the Company in the sales of Services unless otherwise directed in writing to do so by a Company officer and/or director.

(b) Of the Company. The Company agrees to do each of the following:

A. Engage the Consultant as an independent contractor to perform the Services set forth in Exhibit A & Exhibit C to this Agreement.

B. Provide relevant information to assist the Consultant with the performance of the Services.

3. **NATURE OF RELATIONSHIP.**

(a) Independent Contractor Status. The Consultant agrees to perform the Services hereunder solely as an independent contractor and shall remain throughout the term of this Agreement as an independent contractor. Consultant shall determine the method, details, and means of performing and providing any Services. The Parties agree that nothing in this Agreement shall be construed as creating a franchise, agency, employer/employee, or similar relationship between the Parties, or as authorizing either Party to act as the agent of the other. The Consultant is and will remain an independent contractor in its relationship to the Company. The Company shall not be responsible for withholding taxes with respect to the Consultant's compensation hereunder. The Consultant shall have no claim against the Company hereunder or otherwise for vacation pay, sick leave, retirement benefits, social security, worker's compensation, health or disability benefits, unemployment insurance benefits, or employee benefits of any kind. Nothing in this Agreement shall create any obligation between either Party and a third party.

(b)     <u>Consultant's Employees</u>. Consultant's employees, directors, officers, agents, and other persons hired to work under Consultant's authority are, and shall be treated by the Company, as an independent contractor and not as an employee for federal, state and/or local tax purposes.

(c)     <u>Indemnification of Company by Consultant</u>. The Company has entered into this Agreement in reliance on information provided by the Consultant, including the Consultant's express representation that it is an independent contractor and in compliance with all applicable laws related to work as an independent contractor. If any regulatory body or court of competent jurisdiction finds that the Consultant is not an independent contractor and/or is not in compliance with applicable laws related to work as an independent contractor, based on the Consultant's own actions, the Consultant shall assume full responsibility and liability and indemnify, defend, protect, and hold harmless the Company for all taxes, assessments, and penalties imposed against the Consultant and/or the Company resulting from such contrary interpretation, including but not limited to taxes, assessments, and penalties that would have been deducted from the Consultant's earnings had the Consultant been on the Company's payroll and employed as an employee of the Company.

## 4.     CONFIDENTIAL INFORMATION.

The Consultant agrees on behalf of itself, its affiliates, employees, directors, officers, agents, assigns, and other representatives (including without limitation, attorneys, accountants, consultants, and contractors), that during the Term and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm, or corporation without the prior written authorization of the Company, any Confidential Information of the Company. "Confidential Information" means any of the Company's proprietary information, technical data, trade secrets, or know-how, including, but not limited to, research, product plans, products, services, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, applicant and candidate information, or other business information disclosed to the Consultant by the Company, either directly or indirectly. The Consultant may use the Confidential Information to the extent necessary for negotiations, discussions, and consultations with Company personnel or authorized representatives or for any other purpose the Company may hereafter authorize in writing.

## 5.     REPRESENTATIONS AND WARRANTIES.

(a)     The Parties each represent and warrant as follows:

    A. Each Party has full power, authority, and right to perform its obligations under the Agreement.

B. This Agreement is a legal, valid, and binding obligation of each Party, enforceable against it in accordance with its terms (except as may be limited by bankruptcy, insolvency, moratorium, or similar laws affecting creditors' rights generally and equitable remedies).

C. Entering into this Agreement will not violate the charter or bylaws of either Party or any material contract to which that Party is also a party.

(b)  The Consultant hereby represents and warrants as follows:

A. The Consultant has the sole right to control and direct the means, details, manner, and method by which the Services required by this Agreement will be performed. At all times these services will be performed lawfully and within commonly-accepted business practices.

B. The Consultant has the right to perform the Services required by this Agreement at any place or location, and at such times as the Consultant shall determine; except for the performance of such duties as directed by the Company.

C. The Services shall be performed in accordance with standards prevailing in the Company's industry, and shall further be performed in accordance with and shall not violate any applicable laws, rules, or regulations, and the Consultant shall obtain all permits or permissions required to comply with such standards, laws, rules, or regulations.

D. The Services required by this Agreement shall be performed by the Consultant or the Consultant's staff, and the Company shall not be required to hire, supervise, or pay any assistants to help the Consultant perform such Services.

E. The Consultant is responsible for paying all ordinary and necessary expenses of its staff.

F. The Consultant is responsible for providing insurance coverage for itself and its staff, including but not limited to, coverage for Workers Compensation insurance, health, disability, general liability, and unemployment. The Company should be named as an additional insured on the Consultant's Workers Compensation policy to the extent permitted by law.

(c)  The Company hereby represents and warrants as follows:

A. The Company will make payments, due according to the terms of this Agreement, of amounts earned by the Consultant under this Agreement.

*FaceTime Health Partners Services Agreement*                                        4

Initial: _____    Initial _____

B. The Company shall notify the Consultant in writing of any changes to
its procedures affecting the Consultant's obligations under this
Agreement at least 30 days prior to implementing such changes.

C. The Company shall provide such other assistance to the Consultant as
the Company deems reasonable and appropriate.

6.    **COMPENSATION.**

(a)    <u>Terms and Conditions</u>. The Company shall pay the Consultant in
accordance with the terms and conditions set forth in Exhibit A.

(b)    <u>Timing of Payment</u>. Payments shall be made to the Consultant within
fourteen (14) days of the Company's receipt of the Consultant's invoice
(supported by reasonable documentation) for all Services performed to the
Company's satisfaction in accordance with this Agreement, including but
not limited to Exhibit A and Exhibit C.

(c)    <u>No Payments in Certain Circumstances</u>. Notwithstanding the foregoing, no
payment shall be payable to the Consultant under any of the following
circumstances:

A. if prohibited under applicable government law, regulation, or
policy;

B. if the Consultant did not directly perform or complete the Services
described in this Agreement, including but not limited to Exhibit A
and Exhibit C; or

C. if the Services performed occurred after the expiration or
termination of the Term of this Agreement, unless otherwise
mutually agreed to in writing.

(d)    <u>No Other Compensation</u>. The compensation set forth above shall be the
Consultant's sole compensation for performing the Services under this
Agreement. The Consultant shall not accept any additional compensation
directly from an applicant/candidate, client, or proposed client of the
Company's.

(e)    <u>Expenses</u>. Any expenses incurred by the Consultant in the performance of
this Agreement shall be the Consultant's sole responsibility.

(f)    <u>Taxes</u>. The Consultant is solely responsible for the payment of all income,
social security, employment-related, or other taxes incurred as a result of
the performance of the Services by the Consultant under this Agreement

and for all obligations, reports, and timely notifications relating to such taxes. The Company shall have no obligation to pay or withhold any sums for such taxes.

## 7.    REPORTING.

The Consultant shall be required to report to the CMTC Lean Healthcare Director or such other officer or employee as may be designated in writing by the Company. The Consultant shall provide a weekly status report and a monthly written summary report to the Company on its progress. Reports shall consist of the weekly and monthly dashboard events: Positions (where posted, Open/Closed/Filled), Applicants/Candidates (Applied/Screen/Declined), Interviews (Face-to-Face, Passed/Declined), Backgrounds (Cleared/Issues), Offers(Number extended), Acceptances and Declines, Nurse/Recruiter Hours per Applicant/Candidate, Time to Hire, and the Monthly Hospital Account Change Form.

## 8.    WORK FOR HIRE.

The Consultant expressly acknowledges and agrees that any work prepared by the Consultant under this Agreement shall be considered "work for hire" and shall be the exclusive property of the Company unless otherwise specified in writing by the Company. To the extent such work may not be deemed a "work for hire" under applicable law, the Consultant hereby assigns to the Company all of its right, title, and interest in and to such work. The Consultant shall execute and deliver to the Company any instruments of transfer and take such other action that the Company may reasonably request, including, without limitation, executing and filing, at the Company's expense, copyright applications, assignments, and other documents required for the protection of the Company's rights to such materials.

## 9.    NO CONFLICT OF INTEREST; OTHER ACTIVITIES.

The Consultant hereby warrants to the Company that, to the best of its knowledge, it is not currently obliged under an existing contract or other duty that conflicts with or is inconsistent with this Agreement. During the Term (as defined below), the Consultant is free to engage in other independent contracting activities; provided, however, the Consultant shall not accept work, enter into contracts, or accept obligations inconsistent or incompatible with the Consultant's obligations or the scope of Services to be rendered for the Company pursuant to this Agreement. The Consultant and any other of its controlled entities will not perform services in direct competition with the Company for similar services outside this Agreement with any of the Company's clients or proposed clients; and will not use any person or information from the applicant/candidate pool created under this Agreement for any purposes outside of this Agreement. All actions and communications performed by the Contractor under this agreement will be performed with reasonable care. Any healthcare-related recruitment by Consultant outside of this Agreement and/or with parties other than the Company's healthcare clients, must have written notification sent to the Company prior to the performance of any such services.

Initial ____    Initial ____

These conditions shall remain in effect for 1 year (12 months) following the termination of this Agreement.

## 10. TERM.

This Agreement shall become effective as of the Effective Date and, unless otherwise terminated in accordance with the provisions of Section 10 of this Agreement, will continue until the Services have been satisfactorily completed and the Consultant has been paid in full for such Services (hereinafter referred to as the "Term"); provided, however, that in no event shall this Agreement remain effective for longer than 6 months.

## 11. TERMINATION.

This Agreement may be terminated:

    (a)    By either Party upon 30 days prior written notice to the other Party, with or without cause.

    (b)    By either Party for a material breach of any provision of this Agreement by the other Party, if the other Party's material breach is not cured within 30 days of receipt of written notice thereof.

Following the termination of this Agreement for any reason, the Company shall promptly pay the Consultant according to the terms of Section 5.(b) of this Agreement for Services rendered before the effective date of the termination. The Consultant acknowledges and agrees that no other compensation, of any nature or type, shall be payable hereunder following the termination of this Agreement.

## 12. RETURN OF PROPERTY

Within 7 days of the termination of this Agreement, whether by expiration or otherwise, the Consultant agrees to return to the Company all Company products, samples, models, or other property and all documents, retaining no copies or notes, relating to the Company's business including, but not limited to, reports, abstracts, lists, correspondence, information, computer files, computer disks, and all other materials and all copies of such material obtained by the Consultant during and in connection with its representation of the Company. All files, records, documents, blueprints, specifications, information, letters, notes, media lists, original artwork/creative, notebooks, and similar items relating to the Company's business, whether prepared by the Consultant or otherwise coming into its possession, shall remain the Company's exclusive property.

## 13. INDEMNIFICATION.

    (a)    <u>Of Company by Consultant.</u> The Consultant shall indemnify, defend, protect and hold harmless the Company and its officers, members,

managers, employees, agents, contractors, sublicensees, affiliates, subsidiaries, successors, and assigns from and against any and all damages, liabilities, costs, expenses, claims, and/or judgments, including, without limitation, reasonable attorneys' fees and disbursements (collectively, the "Claims") that any of them may suffer from or incur and that arise or result primarily from (i) any negligent, reckless or willful misconduct of the Consultant, its employees, directors, officers, agents, or subcontractors, or (ii) the Consultant's, its employees, directors, officers, agents, or subcontractor's breach of any of Consultant's obligations, agreements, or duties under this Agreement.

(b)     <u>Of Consultant by Company</u>. The Company shall indemnify and hold harmless the Consultant from and against all Claims that it may suffer from or incur and that arise or result primarily from (i) the Company's operation of its business, (ii) the Company's breach or alleged breach of, or its failure or alleged failure to perform under, any agreement to which it is a party, or (iii) the Company's breach of any of its obligations, agreements, or duties under this Agreement; provided, however, none of the foregoing result from or arise out of the actions or inactions of the Consultant.

## 14.     USE OF TRADEMARKS.

The Consultant recognizes the Company's right, title, and interest in and to all service marks, trademarks, and trade names used by the Company and agrees not to engage in any activities or commit any acts, directly or indirectly, that may contest, dispute, or otherwise impair the Company's right, title, and interest therein, nor shall the Consultant cause diminishment of value of said trademarks or trade names through any act or representation. The Consultant shall not apply for, acquire, or claim any right, title, or interest in or to any such service marks, trademarks, or trade names, or others that may be confusingly similar to any of them, through advertising or otherwise. Effective as of the termination of this Agreement, whether by expiration or otherwise, the Consultant shall cease to use all of the Company's trademarks, marks, and trade names.

## 15.     MODIFICATION.

No amendment, change, or modification of this Agreement shall be valid unless in writing and signed by both Parties.

## 16.     ASSIGNMENT.

The Company or Consultant may not, without the written consent of the Company or Consultant assign, subcontract, or delegate its obligations under this Agreement, except that the Consultant may transfer the right to receive any amounts that may be payable to it for its Services under this Agreement, which transfer will be effective only after receipt by the Company of written notice of such assignment or transfer.

17.    **SUCCESSORS AND ASSIGNS.**

All references in this Agreement to the Parties shall be deemed to include, as applicable, a reference to their respective successors and assigns. The provisions of this Agreement shall be binding on and shall inure to the benefit of the successors and assigns of the Parties.

18.    **FORCE MAJEURE.**

A Party shall not be considered in breach of or in default under this Agreement on account of, and shall not be liable to the other Party for, any delay or failure to perform its obligations hereunder by reason of fire, earthquake, flood, explosion, strike, riot, war, terrorism, or similar event beyond that Party's reasonable control (each a "Force Majeure Event"); provided, however, if a Force Majeure Event occurs, the affected Party shall, as soon as practicable:

  (a)    notify the other Party of the Force Majeure Event in writing and its impact on performance under this Agreement; and

  (b)    use reasonable efforts to resolve any issues resulting from the Force Majeure Event and perform its obligations hereunder.

19.    **NO IMPLIED WAIVER.**

The failure of either Party to insist on strict performance of any covenant or obligation under this Agreement, regardless of the length of time for which such failure continues, shall not be deemed a waiver of such Party's right to demand strict compliance in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation under this Agreement shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation.

20.    **NOTICE.**

Any notice or other communication provided for herein or given hereunder to a Party hereto shall be in writing and shall be given in person, by overnight courier, or by mail (registered or certified mail, postage prepaid, return-receipt requested) to the respective Parties as follows:

> If to the Company:
> California Manufacturing Technology Consulting
> Attn: Contracts Department
> 690 Knox Street, Suite 200
> Torrance, Ca. 90502

If to the Consultant:
FaceTime Health Partners
1156 Hugo Reid Drive
Arcadia, Ca. 91007

## 21. GOVERNING LAW.

This Agreement shall be governed by the laws of the State of California. Any and all disputes or claims arising out of or concerning this Agreement shall be settled and determined by one arbitrator (the "Arbitrator") in the City of Los Angeles, California in an arbitration proceeding conducted according to the commercial rules of the American Arbitration Association, in effect at the time of dispute. Any arbitration settlement or determination, including the award of damages, if any, (collectively referred to as the "Award"), shall be in written form and accompanied by an opinion discussing the evidence and reasons for the Award. The Award shall be final and binding on the Parties, and shall include costs and expenses, including reasonable attorney's fees, payable to the prevailing Party. If, in violation of this Contract, any legal action or proceeding other than arbitration is brought, the prevailing Party shall be entitled to recover reasonable attorneys fees and other costs incurred in that action or proceeding, including any costs or fees associated with the transfer of the matter to arbitration, in addition to any other relief to which that Party may be entitled.

## 22. COUNTERPARTS/ELECTRONIC SIGNATURES.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. For purposes of this Agreement, use of a facsimile, e-mail, or other electronic medium shall have the same force and effect as an original signature.

## 23. ATTORNEY FEES.

In the event of any dispute under or by reason of this Agreement, including the interpretation or enforcement hereof, the prevailing party (as determined by the court, agency or other authority before which such suit or proceeding is commenced) in any such dispute shall, in addition to such other relief as may be awarded, be entitled to reimbursement for his actual attorneys' fees, expenses and costs actually incurred, including, but not limited to, attorneys' fees, expenses and costs incurred in appellate proceedings, costs incurred in establishing the right to indemnification.

## 24. SEVERABILITY.

Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed,

Initial _____    Initial _____

and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provisions had never been contained herein.

### 25. ENTIRE AGREEMENT.

This Agreement, constitutes the final, complete, and exclusive statement of the agreement of the Parties with respect to the subject matter hereof, and supersedes any and all other prior and contemporaneous agreements and understandings, both written and oral, between the Parties.

### 26. HEADINGS.

Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

**COMPANY**              California Manufacturing Technology Consulting

By: _John J Van Buren_
Name: John J. Van Buren
Title: Chief Financial Officer

**CONSULTANT**           FaceTime Health Partners

By: _____
Name: Rosa H. Wang
Title: President, Chief Executive Officer

## EXHIBIT A

### DUTIES, SPECIFICATIONS, AND COMPENSATION

A.    **DUTIES.** FaceTime Health Partners (the Consultant) will provide Recruiting Services to California Manufacturing Technology Consulting (the Company). This work will include: Sourcing, Recruiting, Screening, Interviewing, Scheduling, Reviewing, Provide Customer Service and Account Management to the Company's clients. Carry out any provision under the Agreement that is agreed upon in writing between the Company and the Company's client. The Contractor will work and interface with the Company's personnel as required to satisfactorily deliver the Weekly Internal Status Reports, which includes the nurse/recruiter's time records, and the Monthly/Quarterly Client review. No Consultant duties will be performed that do not conform to Exhibit C without the express written consent of the Company. Upon request by the Company, the Contractor may be asked to perform additional duties, not specified in this Agreement, to the benefit of the Company or the Agreement.

B..    **COMPENSATION.**

a) As full compensation for the Services rendered pursuant to this Agreement, the Company shall pay the Consultant a 10% fee based upon the placed candidate's annual salary.

b) Any payments (monthly or otherwise) for services made on behalf of the Consultant by the Company outside of the standard compensation rate for placements will be deducted by CMTC as a chargeback against any standard compensation for placements.

c) Any advances (purchase of equipment and any other advances) made to the Consultant by the Company will be paid back to the Company by the Consultant based upon the following payback schedule: The total amount due to the Company will be paid back monthly in equal payments over the six (6) month term of this Agreement.

## EXHIBIT B

## LIST OF CONSULTANT'S PROPERTY

### (List of Consultant-owned property/equipment follows)

# EXHIBIT B

## CMTC Equipment List to FaceTime Health Partners

**I.    Phones, 5 quantity.**
   a.   Model: CBeyond Blackberry World Addition 8830

| Phone # | Pin# | Current User |
|---|---|---|
| 310-984-0167 | 310D9EF48 | Kimberly Kyle |
| 424-772-8693 | 310D9EF47 | Ruth Seja |
| 310-971-6610 | 319A109E | Sandy Hall |
| 310-984-0348 | 319A10A5 | Lisa Coffman |
| 310-984-9193 | 3109EF45 | Teena Dodgen |

**II.   Wireless Bluetooth Headset, 5 quantity.**
   a.   Model:  Plantronics Voyager Pro
   b.   Current Users: Kimberly Kyle, Ruth Seja, Sandy Hall, Lisa Coffman and Teena Dodgen

**III.  Mobile Wireless Card, 5 quantity**
   a.   Model: CBeyond Mobile Laptop Ovation Access U760

| Phone # on Device | Current User |
|---|---|
| 310-987-3024 | Kimberly Kyle |
| 310-872-6984 | Ruth Seja |
| 310-872-6973 | Sandy Hall |
| 310-987-3749 | Lisa Coffman |
| 310-987-3966 | Teena Dodgen |

## EXHIBIT C
## PROCESS FLOW CHART

**(Process Flow Chart Follows)**

# PORTIONS OF

# EXHIBIT G

# TO BE FILED

# UNDER SEAL

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Mariana R. Pfaelzer and the assigned discovery Magistrate Judge is Charles Eick.

The case number on all documents filed with the Court should read as follows:

## CV12- 8384 MRP (Ex)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

The United States District Judge assigned to this case will review all filed discovery motions and thereafter, on a case-by-case or motion-by-motion basis, may refer discovery related motions to the Magistrate Judge for hearing and determination

=================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Central District of California

| | |
|---|---|
| JAMES DOLAN, an individual; The FaceTime Group, Inc., a California corporation; and FaceTime Recruiters, Inc., a California corporation | ) )  ) ) |
| _Plaintiff(s)_ | ) )  **CV12-08384** MRP(Ex) |
| v. | ) )   Civil Action No. |
| CMTC, a California corporation; CMTC HC LLC, a California corporation; Jack Van Buren, an individual; James Watson, an individual; Doug Garnee, an individual; and DOES 1 through 10 inclusive | ) )  ) ) ) |
| _Defendant(s)_ | ) ) |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  CMTC, a California corporation, 690 Knox St., Ste. 200, Torrance, CA  90502
CMTC HC LLC, a California corporation, 690 Knox St., Ste. 200, Torrance, CA 90502
Jack Van Buren, an individual, 690 Knox St., Ste. 200, Torrance, CA  90502
James Watson, an individual, 690 Knox St., Ste. 200, Torrance, CA  90502
Doug Garnee, an individual, 690 Knox St., Ste. 200, Torrance, CA  90502

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    JARRETT A. GREEN (SBN 237443); NEAL S. ZASLAVSKY (SBN 277543)
NEXUS LAW GROUP, LLP
30 N. RAYMOND AVE., SUITE 304
PASADENA, CA  91103
Tel.: (626) 689-2004
Fax:  (626) 689-2005

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

SEP  2 8 2012

_CLERK OF COURT_

**JULIE PRADO**

Date: _____

_Signature of Clerk or Deputy Clerk_

1154

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| JAMES DOLAN, an individual; The FaceTime Group, Inc., a California corporation; and FaceTime Recruiters, Inc., a California corporation | CMTC, a California corporation; CMTC HC LLC, a California corporation; Jack Van Buren, an individual; James Watson, an individual; Doug Garnee, an individual; and DOES 1 through 50 inclusive |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Jarrett A. Green (SBN 237443); Neal S. Zaslavsky (SBN 277543)<br>Nexus Law Group, LLP<br>30 N. Raymond Ave., Suite 304, Pasadena, CA  91103   tel: (626) 689-2004 | Jonathan A. Hyman, Esq.<br>Knobbe Martens Olson & Bear LLP<br>2040 N. Main St., 14th Floor<br>Irvine, CA  92614 |

## II. BASIS OF JURISDICTION (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

## V. REQUESTED IN COMPLAINT: JURY DEMAND: ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

CLASS ACTION under F.R.C.P. 23: ☐ Yes  ☑ No  ☐ MONEY DEMANDED IN COMPLAINT: $ according to proof and statute

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C.A., Ch. 22 (15 U.S.C.A. 1051 et seq.), Trademark infringement and misappropriation of trade secrets

## VII. NATURE OF SUIT (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☑ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | IMMIGRATION | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus-Alien Detainee | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | | ☐ 871 IRS-Third Party 26 USC 7609 |

FOR OFFICE USE ONLY:   Case Number: **CV12-08384**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or

☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES COUNTY | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES COUNTY | |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
  **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES COUNTY | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date September 27, 2012

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |